HAWLEY & LETZERICH *v.* UNITED STATES (No. 1224).[1]

1. COMPONENT MATERIAL OF CHIEF VALUE.

That component material of chief value means a component material which shall exceed in value any other single component material of the article is the signification prescribed for that phrase by paragraph 481, tariff act of 1909.

2. COTTON BAGGING OF JUTE YARNS.

In the merchandise here jute is the component material of chief value; it constitutes from 70 to 80 per cent of the weight of the materials used in making the goods, while the flax waste and seg employed are used as adulterants. The bagging so made is accordingly of jute and jute butts, substantially, and comes within the meaning and intent of paragraph 355 of the act.

United States Court of Customs Appeals, April 14, 1915.

REHEARING in Abstract 32693 (T. D. 33560).

[Reversed.]

*Comstock & Washburn* for appellants.

*Bert Hanson,* Assistant Attorney General (*Charles E. McNabb,* assistant attorney, of counsel; *Samuel Isenschmid,* special attorney, on the brief), for the United States.

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

SMITH, Judge, delivered the opinion of the court:

In this case, bagging for cotton, classified by the collector of customs at the port of Galveston, Tex., as manufactures in chief value of flax, jute, and other vegetable fibers, was assessed for duty at 45 per cent ad valorem under the provisions of paragraph 358 of the tariff act of 1909, which paragraph is as follows:

358. All woven articles, finished or unfinished, and all manufactures of flax, hemp, ramie, or other vegetable fiber, or of which these substances, or any of them, is the component material of chief value, not specially provided for in this section, forty-five per centum ad valorem.

The importers claimed, in effect, that the bagging for cotton was composed of single yarns made of jute, jute butts, or hemp, and that as the merchandise was within the description of paragraph 355 it was dutiable at six-tenths of 1 cent per square yard as therein provided. Paragraph 355 reads as follows:

355. Bagging for cotton, gunny cloth, and similar fabrics, suitable for covering cotton, composed of single yarns made of jute, jute butts, or hemp, not bleached,

------

[1] Reported in T. D. 35322 (28 Treas. Dec., 606).

dyed, colored, stained, painted, or printed, not exceeding sixteen threads to the square inch, counting the warp and filling, and weighing not less than fifteen ounces per square yard, six-tenths of one cent per square yard.

The board found that the goods were composed of jute, flax, and other vegetable fibers, and that the component material of chief value was not jute, but the vegetable fibers other than jute named in paragraph 358. The assessment of the collector was accordingly sustained by the board, and the importers appealed. This court reversed the board, but on application of the Government granted a rehearing, which was had on December 15, 1914. At the rehearing the Government argued that the court had expressly found that the component material in chief value of the bagging was fibers other than jute and that therefore the goods were dutiable under paragraph 358 as assessed by the collector and as held by the board. We think that a careful reading of the decision of the court will disclose that no such finding of fact was made.

That the bagging was composed of jute fiber, flax, and Russian seg was conceded by both parties to the controversy, but in what proportions those materials were found in the goods was the subject of considerable dispute.

James Cleghorn, one of the manufacturers, testified positively that the several fibers used in making the yarns woven into the bagging were weighed at stated intervals each day and that they were mixed in the proportion of from 70 to 80 per cent of jute, 10 to 15 per cent of flax, and 10 to 15 per cent of seg. He further stated that of the jute fiber two-fifths was jute butts and three-fifths jute waste. According to Cleghorn, jute constituted about 85 per cent and flax and seg taken together about 15 per cent of the value of the bagging. Robert Andrews, a practical jute and flax spinner, said that conservatively speaking there was not less than 75 per cent of jute in the bagging. James Logie, a jute manufacturer, testified that the fibers other than jute found by him in the goods did not exceed 15 or 20 per cent at the outside and that as flax was a light fiber jute would probably constitute more than 85 per cent of the entire weight of the fabric. The testimony of Cleghorn as to the relative proportions of jute, flax, and seg was further supported by Joseph A. Deghuee, an expert in identifying fibers by their structural and chemical differences, and by Henry A. Gassman, a Government examiner charged with the duty of analyzing textile fabrics.

To offset the testimony in favor of the importers the Government introduced analyses made by William Fleming, a fiber expert, and by Walter S. Lewis and R. E. Lofton, physicists in the textile division of the Bureau of Standards. These witnesses did not agree as to the quantities of jute, flax, and seg found by them in the bagging, and analyses made by the same person of different parts of the same sample did not achieve the same result. The witness Lewis found fiber

of jute butts as well as fiber of jute waste in the bagging, and at least to that extent corroborated the positive testimony of importers' witnesses Cleghorn, Andrews, and Logie. He utterly failed, however, to determine or estimate the quantity of jute butts, although jute butts had a much higher value than jute waste.

On this state of the evidence in the case we expressly found that confidence could not safely be given to the analyses made by the Government witnesses and certainly not such confidence as would permit the analyses to outweigh the sworn declarations of the manufacturer who caused the weights to be taken daily of the several materials used in making the goods. We expressly found that jute butts as a component material of the bagging had been established by a clear preponderance of the evidence, and that, as the Government witnesses took no account of the quantity of jute butts present in the fabric, their analyses could not be satisfactorily utilized for the determination of the component of chief value.

Referring to the failure of the Government to show the quantity of jute butts in the bagging, we made use of the following language:

In addition to all this, the analyses of Lewis, Lofton, and Fleming failed to determine the quantity of jute butts which entered into the make-up of the bagging. That jute butts were a constituent part of the goods was affirmatively shown by the testimony of Cleghorn, Andrews, Logie, and Lewis, and as that testimony was denied by no witness except Fleming, we must hold that the presence of jute butts as a component element of the merchandise was established by a clear preponderance of the evidence. Inasmuch as the evidence discloses that jute butts have a much higher value than jute waste, it is apparent that no satisfactory calculation as to the component of chief value can be made from the reports of Lewis, Lofton, or Fleming, failing as they do to give the proportion of jute butts employed in the manufacture of the merchandise.

That statement, we think, can not fairly be taken as a finding that jute butts were not a component of the merchandise or that the value of the flax and seg taken together exceeded the value of the jute waste and jute butts taken together. It did indicate, however, that the court was of the opinion that the values of flax and seg could not be combined in this case for the purpose of ascertaining chief value, and that the jute fiber of the bagging, if it had a greater value than that of *any one* of the other fibers, was the component material of chief value. That "component material of chief value" means that component material which shall exceed in value any other single component material of the article is the signification prescribed for that phrase by paragraph 481, but whether that construction can be put upon it when paragraph 358 comes into competition with paragraph 355 is a debatable question which we think it unnecessary to decide at this time.

Considering that jute butts were proved to be a component of the bagging, that two-fifths of the jute fiber found in the goods was jute

butts, and that the value of jute butts was fixed at not less than 1.8 cents per pound, the value of the jute in the merchandise under discussion exceeded the combined values of all the other fibers found in the goods, even if we were to ignore, which we do not, the unimpeached testimony of the manufacturer and calculate values on the purely tentative basis of 60 per cent for jute, 25 per cent for flax, and 15 per cent for seg.

The Government argues, however, that even if jute be the component material of chief value, the goods must be excluded from the operation of paragraph 355, as they are neither entirely nor substantially made of jute, jute butts, or hemp. We do not think that this contention can be successfully maintained. Taking into account that jute is the component material of chief value, that it constitutes from 70 to 80 per cent of the weight of the materials used in making the goods, and that, as appears from the testimony, flax waste and seg are used to cheapen the product and apparently serve no other purpose than that of adulterants, we think that jute so far predominates in the yarns as to entitle them to the denomination as well as the character of jute yarns, and that it may be fairly concluded that the bagging is composed of yarns made substantially of jute and jute butts, and is therefore within the intent and meaning of paragraph 355. To hold otherwise would, in our opinion, be at variance with the weight of authority and the principles settled by a long line of judicial decisions.

In United States v. Rheims (T. D. 28143), straw braids composed of *71.18 per cent* of straw and *28.82 per cent* of cotton, and in chief value of straw, were assessed for duty by the collector of customs under the following provision of the tariff act of 1890:

374. All manufactures of jute, or other vegetable fiber, except flax, hemp or cotton, or of which jute, or other vegetable fiber, except flax, hemp or cotton, is the component material of chief value, not specially provided for in this act, valued at five cents per pound or less, two cents per pound; valued at above five cents per pound, forty per centum ad valorem.

The importers claimed that the goods were entitled to free entry under paragraph 518 of the same act, which reads as follows:

518. Braids, plaits, laces, and similar manufactures composed of straw, chip, grass, palm-leaf, willow, osier, or rattan, suitable for making or ornamenting hats, bonnets, and hoods.

The United States Circuit Court for the Southern District of New York held that the braids were composed of straw, and in deciding the case said:

The straw braid in question is composed principally, although not wholly, of straw, and in small part of cotton, and is suitable for ornamenting hats. It therefore seems to come within the description of a braid composed of straw suitable for that purpose.

This decision was affirmed by the Circuit Court of Appeals in United States v. Rheims (89 Fed., 1020) and the Government acquiesced (T. D. 15625).

The principle enunciated in United States *v.* Rheims was reiterated and reaffirmed in Schiff *v.* United States (99 Fed., 555, 556).

*In re* Wise (93 Fed., 443) Chinese shoes made up of leather, cotton, silk, thread, and felt, leather chief value, were assessed for duty at 50 per cent ad valorem under the provisions of paragraph 349 of the tariff act of 1890, which in part reads as follows:

349. Clothing ready made, and articles of wearing apparel of every description, * * * composed of cotton or other vegetable fiber, or of which cotton or other vegetable fiber is the component material of chief value, made up or manufactured wholly or in part by the * * * manufacturer, all of the foregoing not specially provided for in this act, fifty per centum ad valorem.

The importers claimed, among other things, that the goods were dutiable under paragraph 456 of the same act, which, in so far as pertinent, reads as follows:

456. * * * Boots and shoes, *made of leather,* twenty-five per centum ad valorem.

No commercial designation for the goods was established.

The Circuit Court for the Northern District of California decided that the goods were shoes made of leather within the intention of paragraph 456, as claimed by the importer.

In Vantine & Co. *v.* United States (3 Ct. Cust. Appls., 488; T. D. 33124) screens composed of a panel of embroidered silk in a wooden frame were assessed for duty by the collector of customs as embroidered articles of silk under that part of paragraph 402 of the tariff act of 1909, which reads as follows:

402. Laces, * * * embroideries, and articles embroidered by hand or machinery, * * * all of the foregoing composed of silk, * * * or of which silk is the component material of chief value, * * *: *Provided,* That articles composed wholly or in chief value of any of the materials or goods dutiable under this paragraph shall pay not less than the rate of duty imposed upon such materials or goods by this section: * * *.

The importers claimed that the screens were screens of wood, dutiable at 35 per cent ad valorem under paragraph 214 of the same act, which reads as follows:

214. Porch and window blinds, baskets, curtains, shades, or *screens of bamboo, wood, straw, or compositions of wood,* not specifically provided for in this section, thirty-five per centum ad valorem; if stained, dyed, painted, printed, polished, grained, or creosoted, forty per centum ad valorem.

This court held that the merchandise was dutiable as assessed, apparently upon the ground that wood was neither the predominant material nor the component material of chief value. Judge Barber, speaking for the court, said:

We can not believe that, in the ordinary understanding of the meaning of the term "screens of wood" as used in paragraph 214, these articles would be so described; the wood is not the component material of chief value, nor is it predominant therein as to the construction or use of the screens.

See also Kenyon v. United States (4 Ct. Cust. Appls., 344; T. D. 33529).

In Fisk v. Arthur (103 U. S., 431) shirtings not made up, composed of linen and cotton, cotton chief value and largely predominating, were assessed for duty as manufactures of cotton under a provision of the tariff act of March 3, 1865, which laid varying rates of duty, according to kind and quality, on "manufactures of cotton." The importer claimed that the goods were dutiable under the provisions of section 22, chapter 68, of the tariff act of March 2, 1861, which was as follows:

Manufactures not otherwise provided for, *composed of mixed materials, in part of cotton, silk, wool, or worsted, or flax.*

The Supreme Court held that the shirtings were manufactures of cotton and were not dutiable under the mixed material clause. Mr. Chief Justice Waite, speaking for the court, said:

Here all manufactures of cotton are provided for in the act of 1864 and its amendments, and the article now in question, in material, quality, and texture, as well as the use to which it is to be applied, is precisely like cotton shirtings. As cotton largely predominates, we think the burden was cast on the importer to show that the change was substantial and not for the purpose of evading the requirements of the law. *It is not pretended that the new article had acquired any distinctive name in commerce, or that it was in any material respect different from similar goods manufactured entirely of cotton.* * * * Linen has been used to a limited extent, not to make goods of "mixed materials," but to make "manufactures of cotton" more useful for some purposes. To hold, upon the facts as they are admitted to be, that these goods were something radically different from cotton shirtings, would be to encourage evasions of the descriptive terms in the tariff laws "by some trifling or colorable change in the fabric or some of its incidents." This we are not inclined to do. (Italics not quoted.)

In Swan v. Arthur (103 U. S., 597) laces, cigar ribbons, galloons, and braids, made of silk and cotton, but in which silk predominated largely, were assessed by the collector as silk laces, ribbons, galloons, and braids under the following provision of the tariff act of June 30, 1864:

On all dress and piece silks, ribbons, and silk velvets, or velvets of which silk is the component material of chief value, sixty per centum ad valorem. On silk vestings, * * * laces, * * * braids, * * * galloons, * * * sixty per centum ad valorem.

The importers claimed that the goods were dutiable at 50 per cent ad valorem as manufactures in chief value of silk under the following provision of the same act:

On all manufactures of silk, or of which silk is the component material of chief value, not otherwise provided for, fifty per centum ad valorem.

The court held that the goods were dutiable as silk laces, ribbons, galloons, and braids, and Mr. Chief Justice Waite, speaking for the court, made use of the following language (at page 598):

*Outside of commerce there can hardly be a doubt that laces, ribbons, galloons, and braids made substantially of silk would be denominated silk goods.* Until, therefore, it was

shown that they were regarded differently by dealers, it was right to class them as dutiable at sixty per cent. The burden of bringing them under the reduced rate was thrown on the importer. So far as the laces, galloons, and braids are concerned, there was no attempt to do so, and in respect to the ribbons the attempt that was made failed before the jury. We can not believe that what are bought and sold in the market as dress or piece silks are not in commercial designation silks because they are to some extent adulterated with a cheaper fiber, if the silk so far predominates over the inferior material that it can be said that they are made substantially of silk. If that is true of piece silks it certainly must be of laces, ribbons, galloons, and braids. *So, in general, it may be said, as we think, that all goods made substantially of silk will be treated as silk commercially, unless it directly appears that commerce has given another name to the admixture.* (Italics not quoted.)

In Drew *v.* Grinnell (115 U. S., 477) certain merchandise invoiced and entered as "white cotton and silk spot net" was assessed for duty by the collector of customs as "silk laces" under the following provision of the tariff act of 1864:

On silk * * * laces, * * * sixty per centum ad valorem.

The testimony of the importers was to the effect that the groundwork of the fabric was silk and the spot upon it was cotton, but that the fabric was made substantially of silk; and upon this the claim was made that they were dutiable under the following provision of the same act:

On all manufactures of silk, *or of which silk is the component material of chief value*, not otherwise provided for, fifty per centum ad valorem.

Apparently no commercial designation was established. The Supreme Court held that the goods were properly assessed as silk laces, and Mr. Justice Blatchford, speaking for the court, said, among other things (at page 481):

The instructions asked for went upon the erroneous view, that an article could not be a silk lace, within the act, unless it was bought and sold by the commercial name of "silk lace." This was the substance of all the instructions asked. Although the article was composed of silk and cotton, yet, if silk was the component material of chief value, and it was a lace, and was known among merchants as a silk lace, it clearly fell within the 60 per cent clause, although a lace wholly of silk also fell within that clause as a silk lace. The evidence on both sides was to the effect that the term "silk laces" was not a commercial term for a particular article, but included all laces made wholly or substantially of silk, each particular lace having a particular trade name, and the article in question being a particular kind of silk lace, called "spotted or dotted net."

In Arthur's Executors *v.* Butterfield (125 U. S., 70) cloth used chiefly for women's dresses and composed *80 per cent hair* and *20 per cent cotton* was assessed for duty by the collector of customs under a provision which read as follows:

Women's and children's dress goods, and real or imitation Italian cloths, composed wholly or in part of wool, worsted, the hair of the alpaca, goat, or other like animals.

The importers claimed that they were dutiable under the following provision:

On hair cloth of the description known as hair seating, * * *. On hair cloth known as crinoline cloth, and on all other manufactures of hair not otherwise provided for.

The jury found that the goods were not known in commerce as women's or children's dress goods, and the Supreme Court held that the cloth was dutiable as claimed by the importers. Mr. Justice Field, speaking for the court in that case, said, among other things (at pages 74-75):

The goods were composed of 80 per cent of hair, and there is no provision of law to which our attention has been drawn that takes goods thus composed, not having a specific commercial designation, from the general designation as manufactures of hair. The finding of the jury is conclusive that they were not known in commerce among merchants and importers as women's and children's dress goods. * * *

The fact that 20 per cent of cotton entered into the composition of the goods and only 80 per cent of them are of hair does not change their character as manufactures of hair within the meaning of the act of 1870. Crinoline and hair seating, both of which are in that act specifically designated as hair cloth, have also cotton in their composition. The designation of a cloth as hair, silk, or cotton depends on the predominance of such article in its composition and not upon absence of any other material. (Italics not quoted.)

In our opinion, the merchandise in controversy, made up as it was, would be denominated "outside of commerce" as bagging for cotton made of jute yarns, and to take it out of the category indicated by that designation it was incumbent on the Government to show that it was not so known to the trade of the country. See Swan v. Arthur, Fisk v. Arthur, and Arthur's Executors v. Butterfield, *supra*.

We think that the weight of authority justifies us in saying that the conclusion reached in our original opinion was correct and that the decision of the Board of General Appraisers should be *reversed*. So ordered.